IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **HIWOT GREEN,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 4:20-cv-01328 |
| | § | |
| **THE KROGER CO.; KROGER TEXAS L.P.** | § | |
| | § | |
| Defendants | § | **(JURY TRIAL DEMANDED)** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Plaintiff, HIWOT GREEN, and files this her Original Complaint complaining of Defendants, THE KROGER CO. and KROGER TEXAS L.P., and in support thereof would show as follows:

### I.
### JURISDICTION, PARTIES, AND VENUE

1.1  This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to: (a) diversity of citizenship; (b) the American with Disabilities Act ("ADA"), as amended; and, (c) the Consolidated Omnibus Budget Reconciliation Act ("COBRA") as it amended the Employee Retirement Income Security Act of 1974.

1.2  Plaintiff resides in Harris County, Texas. Plaintiff was at all relevant times an employee within the meaning of the applicable statutes.

1

1.3 Defendant, The Kroger Co., is a foreign corporation based in Ohio but authorized to do business in Texas and doing business in Texas and may be served by serving it through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

1.4 Defendant, Kroger Texas, L.P., is a foreign limited partnership based in Ohio but authorized to do business in Texas and doing business in Texas and may be served by serving it through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

1.5 Defendants engaged in an industry affecting commerce and employed more than fifteen (15) regular employees.

1.6 The employment practices alleged to be unlawful herein were committed within the Southern District of Texas, Houston Division. Consequently, venue is appropriate in this Court.

**VICARIOUS LIABILITY – RESPONDEAT SUPERIOR**

1.7 Whenever in this complaint it is alleged that Defendants did any act or thing, it is meant that Defendants' owners, vice-principals, managers, supervisors, agents, servants, employees, or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of Defendants, or was done in the normal and routine course and scope of employment of Defendants', including Defendants' owners, vice-principals, managers, supervisors, agents, servants, employees, or representatives, and/or within the normal routine pattern, practice or business operation of Defendants.

1.8   The acts of management were performed while in the employment of Defendants to further Defendants' business, to accomplish the objective for which said managers were hired, and within the course and scope of that employment or within the authority delegated to said employees.

## II.
## FACTUAL BACKGROUND

2.1   Defendants are a grocery store business operating in Texas and in other states.

2.2   Kroger Company operates over 2,000 supermarkets.

2.3   Kroger Company employs more than 400,000 people.

2.4   Plaintiff was an employee of Defendants and began working for Defendants on September 24, 2006.

2.5   Plaintiff worked at Kroger Store No. 315 until 2015.

2.6   In 2015, Plaintiff moved to Store No. 352 at 18030 FM 529 Road, Cypress, Texas 77433.

2.7   Plaintiff worked at Kroger Store No. 352 ("Store 352") until December 4, 2018.

2.8   During 2018, Plaintiff was employed as a Backdoor Receiver, making $15.00 per hour. Plaintiff worked about 40 hours per week on the 6 am to 2 pm shift working Monday, Tuesday, Thursday, Friday and Saturday.

2.9   While employed by Defendants, Plaintiff's compensation included health insurance benefits.

2.10  Before being employed by Defendants, Plaintiff had diabetes.

2.11  At all times of her employment with Defendants, Plaintiff had diabetes.

2.12  Diabetes is a disability because it substantially limits the function of the endocrine system.

2.13  People with diabetes can and do work.

2.14   Plaintiff received healthcare treatment for her diabetes during her employment with Defendants.

2.15   Plaintiff filled her prescriptions for her diabetes at Kroger pharmacies.

2.16   During 2018, Plaintiff wore an electronically monitored insulin pump while working for Defendants.

2.17   In June of 2018, Plaintiff informed Jill Dunn, a manager at Store 352, that she needed carpal tunnel syndrome surgery and would need to take medical leave for the surgery. Jill Dunn instructed Plaintiff to train two coworkers in order to take leave for the surgery. She did.

2.18   Plaintiff's leave for carpal tunnel syndrome surgery began on or about August 11, 2018.

2.19   Like diabetes, carpal tunnel syndrome is a disability.

2.20   During her leave, Plaintiff went to Store 352 to get groceries, and was informed by a Deli Manager, Ms. Pat, that someone from another store was coming to take her job, so Plaintiff checked with Mr. Robert, a co-manager at the store, and was told her job was secure.

2.21   Later, during her leave, Plaintiff went to Store No. 115 to get groceries. While there, Plaintiff spoke to a store co-manager, Day Andrew, and he asked her what she would be doing when she returned to work. When Plaintiff said she would be in her receiving job, Mr. Andrew asked a female co-manager with him whether she would be getting back the girl she sent to Store 352. When Plaintiff stated Plaintiff's name, the woman said she could not discuss that matter with her.

2.22   Therefore, Plaintiff went to Jason Newcomb at Store 352 to ask him about people asking her about her job. Jason Newcomb told Plaintiff that they were wondering if her receiving job was going to be too hard for her because of her diabetes and said he wondered if she

wanted to do something else. Plaintiff stated she did not understand why he was saying that to her, that she did not want to do anything else and that she would be back at work September 19, which was the date her doctor was allowing her to return to work. Plaintiff stated that she thought she was being told this because of her diabetes and that they did not want her working in receiving. Mr. Newcomb stated he would talk to Jill Dunn.

2.23   At the end of Plaintiff's shift on September 24, 2018, Jill Dunn and Jason Newcomb called Plaintiff to the office at Store 352. They complained that Plaintiff was not performing a task with commercial bread and told Plaintiff they wanted her to move to another position. However, during Plaintiff's years at the store, the task had been done by the Frozen Department, so Plaintiff pointed that out and stated she would do as asked when taught how to do so.

2.24   After that, Yolanda, a Store 352 co-manager, started coming by Plaintiff's desk and questioning how Plaintiff did her work and then Plaintiff would be called to the office again where she was questioned again about work she was doing.

2.25   During this time, Evette came to receiving where Plaintiff worked and threw into the trash items Plaintiff separated for mark-out and reject, not trash. Evette told others that Plaintiff did not know how to do Plaintiff's job. Evette told Plaintiff that Martha was supposed to be in Plaintiff's job.

2.26   Plaintiff reported Evette's behavior to Jill Dunn.

2.27   After reporting Evette's behavior to Jill Dunn multiple times, nothing changed in how Plaintiff was treated.

2.28   On December 4, 2018, Plaintiff was supposed to leave work at Store 352, meet her daughter at home, eat and take her daughter to a medical appointment. At or about the time Plaintiff completed her shift, she was called into the office again.

2.29   Jill Dunn, Yolanda and Derek were in the office.

2.30   Plaintiff did not feel well.

2.31   Plaintiff was hypoglycemic.

2.32   Jill Dunn and Yolanda had Plaintiff sign paperwork.

2.33   Jill Dunn knew Plaintiff was diabetic. Jill Dunn also knew that Plaintiff had undergone medical treatment for carpal tunnel syndrome.

2.34   Yolanda knew Plaintiff was diabetic. Yolanda also knew that Plaintiff had undergone medical treatment for carpal tunnel syndrome.

2.35   Derek knew Plaintiff was diabetic. Derek also knew that Plaintiff had undergone medical treatment for carpal tunnel syndrome.

2.36   When Plaintiff arrived home, Plaintiff was walking slow and slurring her words. After she ate food, Plaintiff felt better and took her daughter to the medical appointment.

2.37   Plaintiff did not remember the episode with Jill Dunn, Yolanda and Derek.

2.38   Plaintiff contacted her Union Representative to ask for help finding out what happened in the office with Jill Dunn, Yolanda and Derek.

2.39   Plaintiff's Union Representative got back to Plaintiff and informed her that Defendants claimed Plaintiff quit or resigned.

2.40   On December 5, 2018, Plaintiff entered a grievance against Defendants for unjust suspension/termination.

2.41   Plaintiff did not agree that she quit or resigned.

2.42 Defendants received Tandem Diabetes Care records initialed by Plaintiff's doctor on December 14, 2018 which showed Plaintiff was hypoglycemic during the December 4, 2018 office meeting.

2.43 Dr. Prashant Koshy with The Endocrine Center documented that Plaintiff had a documented episode of hypoglycemia which would affect her cognition and ability to understand/sign paperwork voluntarily resigning from her job.

2.44 Executive cognitive function, which is necessary to carry out many everyday activities, is impaired during hypoglycemia in adults.

2.45 Plaintiff was able to perform the essential functions of her job.

2.46 Defendants did not allow Plaintiff to return to work.

2.47 Defendants maintained that Plaintiff could not return to work.

2.48 In addition, Defendants asserted that Plaintiff voluntarily submitted written resignation in lieu of termination and agreed, in writing, to pay $600.00 restitution for funds, discounts and/or merchandise that Defendants contended were illegally obtained by Plaintiff through a markdown process.

2.49 Markdowns include sellable items and goods, including food.

2.50 Conducting markdowns was part of Plaintiff's job as a Receiver.

2.51 Conducting markdowns was something that Plaintiff regularly did using a price gun device and/or through verbal communication with managers.

2.52 Markdowns generated by the price gun displayed as Manager's Specials.

2.53 Employees were allowed to purchase markdowns and/or Manager's Specials.

2.54 To pay, employees used cash, debit cards, credit cards and/or Kroger plus cards activated by correctly inputting an employee's phone number. Defendants know that sometimes

employees activate Kroger plus cards for their own purchases by inputting phone numbers of other employees.

2.55 Employees competed among themselves to purchase items such as beer and seasonal markdowns.

2.56 It was not a crime for employees to select markdowns for purchase while on-shift during the time Plaintiff was employed at Store 352.

2.57 It was not a crime for employees to select markdowns for purchase while not on-shift during the time Plaintiff was employed at Store 352.

2.58 It was not a crime for employees to purchase markdowns while on-shift during the time Plaintiff was employed at Store 352.

2.59 It was not a crime for employees to purchase markdowns while not on-shift during the time Plaintiff was employed at Store 352.

2.60 During the time Plaintiff was employed at Store 352, employees regularly selected markdown items while on-shift regardless of what a written policy, if any, stated.

2.61 During the time Plaintiff was employed at Store 352, employees regularly purchased markdown items while on-shift regardless of what a written policy, if any, stated.

2.62 Within Defendants' Houston Division, employees regularly select and purchase markdown items while on-shift.

2.63 Within Defendants Houston Division, employees regularly select and purchase markdown items while not on-shift.

2.64 Defendants did not discipline, harass, threaten with termination and fire other employees, including managers, who conducted themselves similarly to Plaintiff at Store 352.

2.65   Plaintiff, like others at the same store, followed the pattern and practice for markdowns at the store, which was known to Defendants.

2.66   Plaintiff did nothing illegal.

2.67   Plaintiff acted in conformity with the markdown pattern and practice allowed by Defendants at Store 352.

2.68   After forwarding correspondence to Defendants requesting preservation of records, including electronically stored information, and requesting Plaintiff's entire personnel file, Plaintiff, through her counsel, wrote to Marlene A. Stewart, Houston-Division – The Kroger Company, and Jill Dunn, Manager of Store No. 352, on January 29, 2019, informing them that Plaintiff no longer had her health benefits so she was at risk for coma and death once her insulin supply ran out.  Defendants were invited to reinstate Plaintiff with full benefits, including health insurance.  (See, Ex. 1).

2.69   Defendants chose to not respond to the correspondence.

2.70   Defendants did not provide Plaintiff's personnel file.

2.71   Defendants did not allow Plaintiff to return to work.

2.72   Instead, Defendants chose to not provide notice to any entity that a qualifying event occurred with regard to Plaintiff so that COBRA-notice could be provided to Plaintiff.

2.73   Defendants did not notify Plaintiff in writing that Plaintiff could retain her health insurance at her own cost.

2.74   Defendants never provided Plaintiff with written COBRA notice concerning what steps she could take to retain her health insurance.

2.75   During her employment with Defendants, Defendants knew Plaintiff was an insulin dependent diabetic who needed insulin in order to survive.

2.76  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, charging Defendants with employment discrimination and retaliation.

2.77  After receiving her Notice of Right to Sue, Plaintiff timely filed her lawsuit against Defendants.

## III.
## CLAIMS & CAUSES OF ACTION

### A. ADA, Texas Commission on Human Rights Act and/or Texas Labor Code

3.1  Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs above and incorporate the same herein as though fully set forth at length herein.

3.2  According to the Equal Employment Opportunity Commission ("EEOC") at eeoc.gov/laws/types/diabetes, with nearly two million new cases diagnosed each year, diabetes is becoming more prevalent in the United States and is the most common endocrine disease. Further, an estimated 18.8 million adults in the United States have diabetes.

3.3  Like diabetes, carpal tunnel syndrome is a disability. People with diabetes can be at risk for carpal tunnel syndrome and certain work-related practices can create risk for carpal tunnel syndrome. Millions of people each year are affected by carpal tunnel syndrome.

3.4  It is unlawful for employers to discriminate against qualified individuals on the basis of disability in regard to advancement or discharge of employees, job training and other terms, conditions and privileges of employment.

3.5  It is unlawful for an employer to make inquiries of an employee as to whether the employee is an individual with a disability or as to the nature or severity of the disability where there is no business necessity to do so.

3.6   Defendants, through their agents, supervisors, or employees violated Plaintiff's civil rights in violation of the ADA, as amended, Texas Commission on Human Rights Act and/or Texas Labor Code by discriminating against Plaintiff based on her disabilities, harassing Plaintiff, retaliating against Plaintiff when she opposed how she was being treated and more based on Plaintiff's disabilities (actual, record of and regarded as).

3.7   Defendants inquired about the severity of Plaintiff's diabetes disability without necessity to do so because of her disabilities.

3.8   Defendants set about to secure a way and/or bases to demote and/or fire Plaintiff before, during and/or after her leave for carpal tunnel syndrome medical treatment because of her disabilities.

3.9   Defendants treated Plaintiff differently from others employed by Defendants in the terms and conditions of her employment because of her disabilities.

3.10  Defendants discriminated against Plaintiff because of her disabilities in the meeting in which she experienced a hypoglycemic episode in the presence of Jill Dunn, Yolanda and Derek when Defendants had Plaintiff sign documents to have Plaintiff quit or resign.

3.11  Defendants regarded Plaintiff as having disabilities and failed to engage Plaintiff in a flexible interactive process to accommodate Plaintiff for the disabilities Defendants regarded her as having.

3.12  Defendants harassed Plaintiff based on her disabilities and failed to prevent the harassing of Plaintiff based on her disabilities.

3.13  Defendants shared among themselves and others Plaintiff's confidential medical information because of her disabilities.

3.14    Defendants retaliated against Plaintiff for her opposition and/or reporting of the disability based harassment and discrimination.

3.15    Defendants terminated and/or constructively discharged Plaintiff because of her disabilities and in retaliation for her opposition and/or reporting of disability based harassment and discrimination to which she was subjected by Defendants.

3.16    Defendants terminated, revoked and/or denied Plaintiff health insurance benefits because of her disabilities and in retaliation for her opposition and/or reporting of disability based harassment and discrimination to which she was subjected by Defendants.

3.17    Defendants, through their agents, supervisors, or employees discriminated and retaliated against Plaintiff which led to the loss and impairment in whole or part, of the wages, benefits, including health insurance, privileges, and terms and conditions of Plaintiff's employment.

3.18    The above-described acts on Defendants' part caused Plaintiff substantial injury and damage.

   **B.   COBRA**

3.19    Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs above and incorporate the same herein as though fully set forth at length herein.

3.20    Plaintiff was employed by Defendants as a full time employee.

3.21    Plaintiff had diabetes during her employment with Defendants.

3.22    Plaintiff had to have insulin to treat her diabetes.

3.23    Plaintiff had health insurance through Defendants health insurance program for Defendants' employees.

3.24 After a person quits a job, that person can temporarily continue their employer-sponsored health insurance coverage through COBRA.

3.25 COBRA is an amendment to Employee Retirement Income Security Act of 1974 ("ERISA") which ensures that employees who lose their coverage under their company's ERISA plan do not go without health insurance before they can find suitable replacement coverage.

3.26 COBRA gives employees who lose their jobs an insurance safety net.

3.27 The only way an employee can retain their employer sponsored health insurance after their job ends is through COBRA.

3.28 Under COBRA, employers who sponsor group health insurance plans must offer employees and qualified beneficiaries the opportunity to continue their health insurance coverage, at group rates but at their own expense, for at least eighteen (18) months, or 547 days, after the occurrence of a qualifying event and notice to the affected employee.

3.29 Defendants are private sector companies employing greater than 20 full time employees.

3.30 COBRA applies to Defendants.

3.31 Plaintiff did not waive COBRA coverage.

3.32 Plaintiff experienced a qualifying event.

3.33 Defendants were obligated to provide Plaintiff with a COBRA notification.

3.34 Defendants' obligation to provide Plaintiff with a COBRA notification was mandatory.

3.35 After her employment with Defendants ended, Defendants never provided Plaintiff with COBRA election notice informing her that she could retain her health insurance coverage at her own cost.

3.36  Once Plaintiff's employment with Defendants ended, Defendants took no steps to make sure Plaintiff received any COBRA election notice.

3.37  Defendants chose to not give Plaintiff information Defendants were required to provide to Plaintiff under COBRA.

3.38  When an employer fails to satisfy COBRA requirements by, for example, failing to provide COBRA election notice, the employer can be liable to the employee for statutory penalties of up to $100 a day from the date of the failure under the civil enforcement provisions of ERISA and/or under the Internal Revenue Code ("IRC").

3.39  The above-described acts on Defendants' part were done in bad faith and caused Plaintiff substantial injury and damage.

3.40  Plaintiff seeks imposition against Defendants of all damages and/or statutory penalties allowed by law, whether pursuant to ERISA, IRC, COBRA and/or any other related statute or code, to their fullest extent allowed by law.

## IV.
## JURY DEMAND

4.1  Plaintiff requests that this action be heard before a jury.

## V.
## DAMAGES

5.1  Defendants' conduct constitutes violations of statutory and common law. Such unlawful conduct seriously affects Plaintiff in her occupation, trade, and business. Because of Defendants' unlawful conduct, Plaintiff incurred lost wages in the past and future and has suffered, suffers, and will continue to suffer humiliation, stress, mental anguish, loss of enjoyment of life, and other damages in the past and future. Plaintiff has suffered direct injury as a proximate result of the unlawful disciplinary practices, policies, and procedures

of the Defendants. Accordingly, Plaintiff seeks all general, special, incidental, economic, compensatory, and consequential damages, as well as exemplary and/or punitive damages and statutory penalties, in an amount to be proved at trial.

5.2 Because of Defendants' unlawful and egregious conduct, it has been necessary for Plaintiff to retain the undersigned attorney to represent her. Plaintiff seeks recovery of reasonable attorney fees to the fullest extent allowed by law.

5.3 Additionally, Plaintiff has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve her ability to earn a living. Accordingly, Plaintiff seeks all general, special, incidental, and consequential damages as shall be proven at trial.

5.4 Further, Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to the Defendants. Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event the Defendants do not promptly tender damages assessed against them and to avoid unjustly enriching the Defendants.

## VI.
## PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendants be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendants, jointly and severally, for:

    a. Permanent injunction enjoining Defendants, their agents, successors, employees, and those acting in consort with Defendants from engaging in any employment practice which discriminates on the basis of disability in violation

of the ADA, as amended, Texas Human Right Commission and/or Texas Labor Code as outlined above;

b. Permanent injunction enjoining Defendants, their agents, successors, employees, and those acting in consort with Defendants from engaging in employment practices that violate COBRA as outlined above;

c. All damages to which Plaintiff may be entitled pursuant to this Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement or front pay in lieu of reinstatement, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

d. Compensatory damages for pain and mental suffering in the past and future;

e. Punitive and/or exemplary damages in the maximum amount allowed by law;

f. Reasonable attorney's fees with conditional awards in the event of appeal;

g. Statutory penalties allowed by law;

h. Pre-judgment interest at the highest rate permitted by law;

i. Post-judgment interest from the judgment until paid at the highest interest rate permitted by law;

j. Costs of court and expert witness fees incurred by Plaintiff in preparation and prosecution of this action; and

k. Such other and further relief, at law or in equity, to which Plaintiff may be justly entitled, whether by this Complaint or by any amendment hereto, for which Plaintiff will forever pray.

Respectfully submitted,

*/s/ Cletus Ernster*

Cletus Ernster
Ernster Law Firm, PLLC
State Bar No. 00793698
Federal Bar No. 17822
1214 Elgin Street
Houston, Texas 77004
(713) 821-9433 – Telephone
(713) 522-7410 – Facsimile
ce@ernsterfirm.com

ATTORNEY FOR PLAINTIFF
HIWOT GREEN